UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Lauri Ann Bonneau,

    Plaintiff,

    v.                                                  Civil Action No. 5:13-cv-26

Commissioner of Social Security,

    Defendant.

## REPORT AND RECOMMENDATION
(Docs. 6, 9)

Plaintiff Lauri Bonneau brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security income and disability insurance benefits. Pending before the Court are Bonneau's motion to reverse the Commissioner's decision (Doc. 6), and the Commissioner's motion to affirm the same (Doc. 9). For the reasons stated below, I recommend that Bonneau's motion be GRANTED, in part; the Commissioner's motion be DENIED; and the matter be REMANDED for further proceedings and a new decision.

## Background

Bonneau was 41 years old on her alleged disability onset date of June 10, 2009. She is divorced, and has three grown children; the youngest was approximately 15 years old during the alleged disability period. From approximately

September 1987 through June 2009, Bonneau held various jobs as a licensed practical nurse. (AR 246–54.) She has also worked part time as a hostess/manager at a fitness center that she and her ex-husband built and owned. (AR 37.)

Bonneau has a longstanding history of bipolar disorder, depression, uneven moods, anger, decreased energy, crying spells, and low stress tolerance. (AR 676.) She has been treated with antidepressants, stimulants, mood stabilizers, and anti-anxiety medications. (*Id.*) In addition to her psychological impairments, Bonneau has had two back surgeries and suffers from back and leg pain as well as bowel incontinence. (AR 46–49.) She testified at the administrative hearing that she was fired after working only nine days at her most recent job, which involved providing medication to inmates, because she could not keep the pace and was making medication errors. (AR 34–35.) Bonneau also testified that she stopped working because she had problems concentrating, did not get along with coworkers, suffered "incredible" anxiety to the point of wanting to vomit when she went to work, and had very little energy. (AR 31–32.)

On the date of the administrative hearing, Bonneau was living in an apartment with her boyfriend. Although she worked and raised her children prior to her alleged disability onset date, since then, her days have involved much less activity. She testified that on a typical day, she watches television, naps, and picks up around the house. (AR 32–33.) On good days, she may take her dogs for a swim or go to the store, but she prefers not to be around people and is scared to go out alone. (AR 41–43.) On bad days—which she says occur more often than good days—she stays home and lies on the couch. (AR 42.)

In April 2009, Bonneau protectively filed applications for social security income and disability insurance benefits. In her disability application, she alleges that she has been unable to work due to her bipolar disorder. (AR 218.) She further alleges that her physical conditions, including bowel incontinence and chronic back and leg pain, cause her increased anxiety. (AR 238–39.) Bonneau's applications were denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on April 16, 2012 by Administrative Law Judge ("ALJ") Thomas Merrill. (AR 28–56.) Bonneau appeared and testified, and was represented by an attorney. In addition, a vocational expert ("VE") appeared and testified at the hearing.

On June 7, 2012, the ALJ issued a decision finding that Bonneau was not disabled under the Social Security Act from her alleged disability onset date through the date of the decision. (AR 11–21.) Thereafter, the Appeals Council denied Bonneau's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–3.) Having exhausted her administrative remedies, Bonneau filed the Complaint in this case on February 8, 2013. (Doc. 3.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant

3

has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Bonneau had not engaged in substantial gainful activity since her alleged disability onset date of June 10, 2009. (AR 14.) At step two, the ALJ found that Bonneau had the severe

4

impairments of bipolar affective disorder and degenerative disc disease of the lumbar spine status post microdiscectomy. (*Id.*) At step three, the ALJ found that none of Bonneau's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 14–15.) Next, the ALJ determined that Bonneau had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Bonneau] is limited to standing and walking for two hours in an eight-hour work day. [She] is capable of performing tasks that involve one-to-three . . . steps. She can perform this work for two-hour periods over the course of an eight-hour workday and forty-hour workweek. [She] can interact with the general public and sustain routine interactions and routine workplace changes. She is aware of hazards and can travel, plan, and set goals.

(AR 15.) Given this RFC, the ALJ found that Bonneau was unable to perform her past relevant work as a licensed nurse and a health-club manager. (AR 19.) Based on testimony from the VE, however, the ALJ determined that Bonneau could perform other jobs existing in significant numbers in the national economy, including the jobs of office helper, mail clerk, courier, charge-account clerk, surveillance-system monitor, and eyeglass assembler. (AR 20.) The ALJ concluded that Bonneau had not been under a disability from the alleged onset date of June 10, 2009 through the date of the decision. (AR 21.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Bonneau's principal argument is that the ALJ erred in his analysis of the opinions of treating psychiatrist Dr. Richard Edelstein. More specifically, Bonneau asserts that the ALJ did not follow the treating physician rule and did not provide good reasons for giving limited weight to Dr. Edelstein's opinions. In response, the Commissioner argues that substantial evidence supports the ALJ's assignment of weight to the medical opinions, and that the ALJ cited substantial evidence contradicting Dr. Edelstein's opinions.

In June 2009, Dr. Edelstein began treating Bonneau, seeing her on a monthly basis. (AR 279–90, 654–74.) Bonneau was often tearful and anxious at her appointments (AR 283, 286–87, 289, 655–57, 659, 665, 674), and Dr. Edelstein switched medications and changed medication doses multiple times in an attempt to address Bonneau's irritability, decreased mood, and mood cycling (AR 280–81, 288, 665–66, 673). In March 2011, Dr. Edelstein stated in a treatment note that, "because of her mood lability[1] and episodes of emotional dysregulation, I support her applying for disability [benefits] at this time." (AR 688.) In an October 2011 Psychiatric Evaluation, after noting that Bonneau had been a patient in his practice for approximately ten years and carried the bipolar II[2] diagnosis, Dr. Edelstein stated that Bonneau "has nearly a life-long

---

[1] "Emotional lability," also referred to as "mood lability," is defined as "[e]xcessive emotional reactivity associated with frequent changes or swings in emotions and mood." F.A. Davis Co., *Taber's Cyclopedic Medical Dictionary* (2011), *available at* Lexis TABMED.
[2] "Bipolar II mood disorder" is defined as "[a] mood disorder characterized by the occurrence of one or more major depressive episodes accompanied by at least one hypomanic episode. . . . [T]he symptoms must cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. F.A. Davis Co., *Taber's Cyclopedic Medical Dictionary* (2011), *available at* Lexis TABMED.

7

history of mood lability and emotional dysregulation." (AR 677.) Finally, in a March 2012 Questionnaire, Dr. Edelstein opined that, although Bonneau has only "[s]light" restrictions in activities of daily living, she has "[m]arked" difficulties in maintaining social functioning and "[m]arked" deficiencies of concentration, persistence, or pace. (AR 695.) Dr. Edelstein further opined that Bonneau has "low frustration tolerance," explaining that "even small frustrations can cause [her to decompensate]." (AR 696.) Dr. Edelstein noted in the Questionnaire that Bonneau has had depression since her twenties, with "gradual inability to work, and decreased functioning . . . in the work place for 3 y[ea]rs." (*Id.*) Also in March 2012, Dr. Edelstein opined in an Assessment of Ability to Do Work-Related Activities (Mental) that, due to her "[e]xtremely low frustration tolerance," Bonneau had "[m]arked" limitations in her ability to respond appropriately to usual work situations and coworkers, respond appropriately to changes in a routine work setting, deal with work stress, and maintain attention/concentration; and had "[e]xtreme" limitations in her ability to respond appropriately to supervision. (AR 697.) Dr. Edelstein concluded in the Assessment that Bonneau's "emotional lability and low frustration tolerance could compromise her ability to complete a typical 40-h[ou]r week." (AR 699.)

     The ALJ afforded "limited weight" to these opinions on the grounds that: (1) they are "inconsistent with each other"; and (2) Dr. Edelstein's treatment notes "do not document a presentation consistent with [them]." (AR 18.) The ALJ explained that Bonneau's "condition appears largely controlled[,] with temporary exacerbations due to stressors or medication noncompliance." (AR 18–19.) For the reasons explained below,

8

I find that substantial evidence does not support these findings. Moreover, the ALJ did not follow the treating physician rule in his analysis of Dr. Edelstein's opinions.

Because Dr. Edelstein was Bonneau's treating physician, the ALJ was required to employ the treating physician rule in analyzing his opinions. That rule states that a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993). Even when a treating physician's opinion is not given controlling weight, the opinion is still entitled to *some* weight because a treating physician is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence . . . ." 20 C.F.R. § 404.1527(c)(2). When the ALJ decides to afford less than controlling weight to a treating physician's opinion, the ALJ must consider the regulatory factors—including but not limited to, the length of the treatment relationship, the frequency of examination, and whether the treating physician's opinion is consistent with the record as a whole—in determining how much weight is appropriate. *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)); *see* 20 C.F.R. § 404.1527(c). After considering these factors, the ALJ must "give good reasons" for the weight afforded to the treating source's opinion. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (quotation marks and citation omitted). The Second Circuit has consistently held that the

9

failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

Here, the ALJ did not give good reasons for affording limited weight to Dr. Edelstein's opinions. First, the ALJ failed to consider the length and frequency of Dr. Edelstein's and Bonneau's treatment relationship. Dr. Edelstein started treating Bonneau in June 2009 (AR 290), and therefore had been treating her for almost three years when he gave his March 2012 opinion. He saw Bonneau on a monthly basis, and thus had seen her many times when he gave his opinion. (AR 279–91, 653–75.) In contrast, agency consultant Dr. William Farrell—whose opinion the ALJ gave "great weight"—never examined or treated Bonneau. Second, the ALJ failed to consider that Dr. Edelstein specializes in psychiatry, the area of specialization most relevant to Bonneau's disabling impairments. Third, and most importantly, substantial evidence does not support the ALJ's finding that Dr. Edelstein's opinions are inconsistent with each other and unsupported by his treatment notes.

The only specific inconsistency among Dr. Edelstein's opinions that the ALJ mentions is Dr. Edelstein's assignment of a Global Assessment of Functioning ("GAF") score of 55–60[3]—which the ALJ characterized as "reflective of being in the high end of *moderate* symptoms"—in his October 2011 Psychiatric Evaluation, as compared to Dr.

---

[3] A GAF score of 55–60 places Bonneau in the category of "51–60," which indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co[]workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 32 (4th ed. 2000).

10

Edelstein's opinion a few months later in his March 2012 Assessment that Bonneau was *markedly* limited in performing work-related activities. (AR 18 (emphasis added).) But GAF scores reflect only a snapshot in time, *see Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010), whereas Dr. Edelstein's March 2012 Assessment addressed Bonneau's limitations "on a sustained (day-to-day) basis in a regular work setting" (AR 697). Moreover, as noted above, Dr. Edelstein completed the Assessment approximately five months after he assigned the GAF score to Bonneau, and thus he had the benefit of a longer treatment relationship with Bonneau when completing the Assessment. Further, other statements contained in the October 2011 Evaluation reflect that Dr. Edelstein believed Bonneau's mental problems were significant at that time. For example, Dr. Edelstein stated that Bonneau had "a nearly life-long history of mood lability and emotional dysregulation, in the context of [a] history of childhood emotional abuse," and that "[c]urrent medication treatment is only partially successful in ameliorating symptomatology." (AR 677.) Accordingly, and also based on a simple comparison of the statements made in each of Dr. Edelstein's opinions (described summarily above), I do not find that these opinions are inconsistent with each other.

I also do not find that Dr. Edelstein's opinions are unsupported by his treatment notes. As discussed above, these notes document that Bonneau was often tearful and anxious at her monthly appointments for irritability, decreased mood, and mood cycling (AR 283, 286–87, 289, 655–57, 659, 665, 674); had to switch medication and medication doses multiple times in an attempt to address her symptoms (AR 280–81, 288, 665–66, 673); and suffered mood lability and episodes of emotional dysregulation (AR 688).

11

Although the ALJ focused on those of Dr. Edelstein's treatment notes which documented less symptomatology, concluding that Bonneau's symptoms were only sporadic and temporary; Dr. Edelstein himself did not make the same conclusion. Rather, Dr. Edelstein believed that, even though Bonneau could perform most activities of daily living, and even though she might not always have been symptomatic in the treatment setting, she had frequent and persistent episodes of deterioration of social functioning and concentration which impeded her ability to work.

Dr. Edelstein's opinions are not only consistent with each other and with his own treatment notes, they are also consistent with and supported by the medical record as a whole. For example, Dr. Kiley[4], a psychiatrist who treated Bonneau for almost nine years (prior to Dr. Edelstein taking over), recorded in her final treatment note dated April 27, 2009, that Bonneau had a long history of depression and anxiety that was seemingly resistant to medications, and there was positive evidence of mood cycling documented by careful mood logs. (AR 292–93.) The treatment note listed as Bonneau's diagnosis bipolar II disorder, rapid cycling. (*Id.*) Taken as a whole, Dr. Kiley's treatment notes—although they were prepared before the alleged disability period—document Bonneau's changing moods; difficulty handling life stressors; and many attempts to find medications, including lithium, Wellbutrin, and Effexor, to effectively address her mood disorder, depression, and anxiety. (*See, e.g.*, AR 274–78, 293–413, 416–18.) These treatment notes are consistent with Dr. Edelstein's opinions, but the ALJ failed to discuss them.

---

[4] As pointed out by the Commissioner, Bonneau erroneously refers to Dr. Kiley as "Dr. Niemira" in parts of her Motion. (*See* Doc. 6-1 at 11, 13, 16; Doc. 9 at 15 n.3; Doc. 11 at 1 n.1.)

The opinion of Bonneau's vocational rehabilitation counselor, Jody Casey, is also consistent with Dr. Edelstein's opinions. In May 2010, after having worked with Bonneau for over nine months, Casey stated that she supported Bonneau's disability claim "based on observations and interactions with her." (AR 420.) Casey explained that Bonneau was "very tearful and agitated," and reported "extreme fatigue, memory issues, and problems with concentration." (*Id.*) Casey concluded: "It would be impossible for [Bonneau] to function in a work situation at this time." (*Id.*) The ALJ considered this opinion, but gave it "little weight" because: (1) Casey is not an acceptable medical source; and (2) the record does not contain any of Casey's treatment notes, thus making it impossible for the ALJ to evaluate the consistency of her opinion. (AR 19.) Although these are proper reasons to afford less weight to Casey's opinion, the ALJ inconsistently gave "great weight" to the opinion of agency consultant Dr. Farrell without acknowledging that he had never even met with Bonneau and thus, like Casey, did not have any treatment notes to evaluate the consistency of his opinions. (*Id.*)

As noted above, the ALJ defended his decision to give limited weight to Dr. Edelstein's opinions by stating that Bonneau's mental problems were largely controlled and only temporarily exacerbated "due to stressors or medication noncompliance." (AR 18–19.) These are not "good reasons" to discredit Dr. Edelstein's opinions. Even accepting as true the ALJ's statement that Bonneau's mental problems were exacerbated by "stressors" (AR 19), this does not undercut her disability claim. The relevant issue is how Bonneau was able to handle those stressors, and the record reflects that her ability to handle them deteriorated over the years. Specifically, she progressed from being able to

work full time as a licensed nurse while also caring for her children and keeping up with household chores in a large home, to being unable to work and being able to do only minimal household chores in a small apartment. (AR 31–38, 190–91, 246–53.) The record reflects that Bonneau consistently reported her symptoms over the years, but she had decreasing capacity to overcome them.

Regarding the finding that Bonneau did not comply with recommended medications, the ALJ stated that Bonneau "decreased [l]ithium at one point and had an increase in anger and irritability," and "ran out of Topamax and Effexor then became more moody and irritable." (AR 18.) The ALJ should have considered the reasons for this change and omission in medications, and determined whether they were justifiable. *See Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985) (a claimant's refusal to undertake treatment must be "without justifiable excuse"); *Pimenta v. Barnhart*, No. 05 Civ. 5698(JCF), 2006 WL 2356145, at *6 (S.D.N.Y. Aug. 14, 2006) ("[A] claimant may have legitimate reasons for refusing treatment. . . . '[A] full evaluation must be made in each case to determine whether the individual's reason(s) for failure to follow prescribed treatment is justifiable.'") (quoting SSR 82-59, 1982 WL 31384, at *4 (1982)). The record reveals that, although Bonneau initiated the decrease in lithium, Dr. Edelstein acquiesced because lab reports demonstrated "persistently elevated Cr[5] [levels]." (AR 281; *see also* 279, 280, 283.) Dr. Edelstein stated: "Persistently elevated Cr is of concern. . . . Will consider a switch to Neurontin." (AR 281.) The treatment note

---

[5] Presumably, "Cr" refers to "creatinine." Lithium has been shown to increase creatinine levels in some patients, possibly leading to an adverse effect on renal function. Sarah McCann, James Daly & Christopher Kelly, *The Impact Of Long-Term Lithium Treatment On Renal Function In An Outpatient Population*, 77(2) Ulster Med J.102-05 (May 2008), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2516429/.

documenting Bonneau's omission of Effexor and Topomax merely states that Bonneau "ran out of Effexor and Top[o]max and couldn't refill due to temporary lapse in insurance." (AR 286.) Such a minor and temporary incidence of noncompliance is of little significance, especially given that the noncompliance was due to a lapse in insurance, not because Bonneau did not require the medication or because her symptoms ameliorated.

The only opinions to which the ALJ gave "great weight" were those of non-examining agency consultant Dr. Farrell. (AR 19.) In August 2010, Dr. Farrell opined that, although Bonneau had the medically determinable impairment of bipolar II with rapid cycling, she experienced only mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, or pace. (AR 550, 557.) Dr. Farrell also opined that Bonneau had sufficient memory and understanding for one-to-three-step tasks; and had sufficient concentration, persistence, and pace to sustain for two-hour blocks of time in one-to-three-step, low-stress work activities. (AR 563.) In affording great weight to these opinions, the ALJ stated that Dr. Farrell's opinions are "supported by and consistent with the evidence of record," including Bonneau's GAF scores, her presentation at office visits, and her activities of daily living. (AR 19.) The ALJ failed to acknowledge two significant facts, however.

First, Dr. Farrell never met or treated Bonneau, in contrast with Dr. Edelstein, Dr. Kiley, and counselor Casey. Generally, where, as here, there are conflicting opinions between the treating and consulting sources, the "consulting physician's opinions or report should be given limited weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990);

15

*see Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990).  Second, Dr. Farrell made his opinions prior to Dr. Edelstein giving any of his three opinions, and thus he did not have the opportunity to consider these important treating physician opinions in his reports. The Second Circuit has held that, where it is unclear whether an agency consultant reviewed "all of [the plaintiff's] relevant medical information," the consultant's opinion is not supported by the evidence of record, as required to override the opinion of a treating physician.  *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011).

Accordingly, I find that the ALJ did not follow the treating physician rule and did not provide "good reasons" for affording limited weight to the opinions of treating physician Dr. Edelstein.  The ALJ's decision to afford only limited weight to Dr. Edelstein's opinions affected the ALJ's assessment of Bonneau's credibility and determination of Bonneau's RFC.  Moreover, Dr. Edelstein opined that Bonneau would miss more than two work days each month due to her mental impairments (AR 699), and the VE testified that, with that limitation, no jobs would exist for Bonneau (AR 54–55). Therefore, the ALJ's failure to properly weigh Dr. Edelstein's opinions is not harmless error, and the claim should be remanded.  On remand, if the ALJ finds that there are "clear gaps in the administrative record," including in Dr. Edelstein's opinions or treatment notes, the ALJ should attempt to fill these gaps by seeking additional information.  *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

## Conclusion

I recommend remanding this matter for a new analysis of Dr. Edelstein's opinions, a reassessment of Bonneau's credibility, and a redetermination of Bonneau's RFC.

Bonneau requests that, instead of remanding for further proceedings, the Court should reverse and remand solely for payment of benefits. (Doc. 6-1 at 16.) But in cases where there are gaps in the administrative record or, as here, the ALJ has applied an improper legal standard, it is more appropriate to remand for further proceedings and a new decision. *Rosa*, 168 F.3d at 82–83; *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). Thus, Bonneau's request that the matter be reversed and remanded solely for payment of benefits should be denied.

      For these reasons, I recommend Bonneau's motion (Doc. 6) be GRANTED, in part; the Commissioner's motion (Doc. 9) be DENIED; and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling.

      Dated at Burlington, in the District of Vermont, this 15th day of November, 2013.

/s/ John M. Conroy  
John M. Conroy  
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).